

Doo#: 0709518080 Fee: $152.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 04/05/2007 04:00 PM Pg: 1 of 85

**MERS MIN: 8000101-0000004416-3**

MS-GRAND HOLDINGS ILLINOIS, LLC, as mortgagor

(Borrower)

to

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as mortgagee
(Mortgagee)

### MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**This document serves as a fixture filing under the Uniform Commercial Code.
Borrower's Organizational Identification Number: 0211363-5**

Dated:      March 1, 2007

Location:    10280 South Harlem Avenue, Bridgeview, Illinois

County:     Cook

PREPARED BY AND UPON
RECORDATION RETURN TO:

Greenberg Traurig
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
Attention: David Fairman

First American Title Order # NCS 246142

LA 128734003v2 007134.010000

(c) the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "Improvements");

(d) all easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e) all machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(f) all leases and other agreements affecting the use, enjoyment or occupancy of the Land and the Improvements heretofore or hereafter entered into, including a guaranty of any such lease (a "Lease" or "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g) all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

2

for use in the payment of such sums. For purposes of this Section 1.2, the terms "Lease Guaranties" and "Bankruptcy Claims" shall have the meanings ascribed to such terms in that certain Assignment of Leases and Rents by and between Borrower and Mortgagee dated as of even date herewith.

Section 1.3    SECURITY AGREEMENT☐ This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Mortgagee, as security for the Obligations (defined in Section 2.1), a security interest in the Property to the full extent that the Property may be subject to the Uniform Commercial Code.

Section 1.4    PLEDGE OF MONIES HELD☐ Borrower hereby pledges to Mortgagee any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (as defined in Section 3.5), Net Proceeds (as defined in Section 4.4) and condemnation awards or payments described in Section 3.6 and any accounts established pursuant to the Cash Management Agreement, as additional security for the Obligations until expended or applied as provided in this Security Instrument.

Section 1.5    GRANTS TO MORTGAGE☐ This Security Instrument and the grants, assignments and transfers made to Mortgagee in this Article 1 shall inure to Mortgagee solely in its capacity as Lender's nominee.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Mortgagee, and the successors and assigns of Mortgagee, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall well and truly perform the Other Obligations as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, these presents and the estate hereby granted shall cease, terminate and be void.

## Article 2- PAYMENTS

Section 2.1    DEBT AND OBLIGATIONS SECURED☐ The Security Instruments and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the following, in such order of priority as Lender may determine in its sole discretion (the "Debt"): (a) the payment of the indebtedness evidenced by the Note in lawful money of the United States of America; (b) the payment of interest, prepayment premiums, default interest, late charges and other sums, as provided in the Note, the Security Instruments or the Other Security Documents (defined below); (c) the payment of all other moneys agreed or provided to be paid by Borrower in the Note, the Security Instruments or the Other Security Documents; (d) the payment of all sums advanced pursuant to the Security Instruments to protect and preserve the Property and the lien and the security interest created hereby; and (e) the payment of all sums

4

of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but the amount shall in no event be less than the outstanding principal balance of the Note; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions or to be written on a no co-insurance form; (C) providing for no deductible in excess of Ten Thousand and No/100 Dollars ($10,000.00) for all such insurance coverage and (D) if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses, coverage for loss due to operation of law in an amount equal to the Full Replacement Cost, coverage for demolition costs and coverage for increased costs of construction. In addition, Borrower shall obtain: (x) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the lesser of (1) the outstanding principal balance of the Note or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended or such greater amount as Lender shall reasonably require; and (y) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity;

(ii)     business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above; (C) in an annual aggregate amount equal to all rents or estimated gross revenues from the operation of the Properties (as reduced to reflect expenses not incurred during a period of Restoration) and covering rental losses or business interruption, as may be applicable, for a period of at least twelve (12) months, after the date of the casualty, and notwithstanding that the Policy may expire prior to the end of such period. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twelve (12) month period. All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the Obligations from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Obligations on the respective dates of payment provided for in the Note, this Security Instrument, and the Other Security Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iii)     at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance, otherwise known as Owner Contractor's Protective Liability, covering claims not covered by or under the terms or provisions of the commercial general liability insurance policy in (v) below; and (B) the insurance

6

terrorism exclusion, on terms consistent with the commercial property insurance policy required under subsection (a) above and otherwise satisfactory to Lender; provided, however, if such terrorism insurance is obtainable from any insurer or the United States of America or any agency or instrumentality thereof and the lack of such insurance in and of itself will result in a downgrade by any rating agency issuing any statistical rating in any Secondary Market Transaction to the then current ratings assigned, or to be assigned, to the Securities (as hereinafter defined) or any class thereof, Borrower shall obtain such insurance.

(b)     All insurance provided for in Section 3.3(a) shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), shall be satisfactory in form and substance to Lender and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies (i) shall be issued by financially sound and responsible insurance companies approved by Lender and authorized or licensed to do business in the state where the Property is located, with a claims paying ability rating of "A" or better by Standard & Poor's Corporation or a rating of "A:VII" or better in the current Best's Insurance Reports; (ii) except for the Policy referenced in Section 3.3(a)(vii) shall name Borrower as the insured and Lender as an additional insured, as its interests may appear; (iii) in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York Non-Contributory Standard Mortgagee Clause and (other than those strictly limited to liability protection) a Lender's Loss Payable Endorsement (Form 438 BFU NS), or their equivalents, naming Lender as the person to which all payments made by such insurance company shall be paid; (iv) shall contain a waiver of subrogation against Lender; (v) shall be maintained throughout the term of this Security Instrument without cost to Lender; (vi) shall be assigned and the originals (or duplicate originals certified to be true and correct by the related insurer) delivered to Lender; and (vii) shall contain such provisions as Lender deems reasonably necessary or desirable to protect its interest including, without limitation, endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under said Policies and that Lender shall receive at least thirty (30) days prior written notice of any modification, reduction or cancellation.. Any blanket Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 3.3(a). Borrower shall pay the premiums for such Policies (the "**Insurance Premiums**") as the same become due and payable and shall furnish to Lender evidence of the renewal of each of the new Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Lender (provided that such Insurance Premiums have not been paid to Lender or Lender's servicing agent pursuant to Section 3.5 hereof). If Borrower does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any apparently expiring Policy, then Lender may procure, but shall not be obligated to procure, such insurance and pay the Insurance Premiums therefor, and Borrower agrees to reimburse Lender for the cost of such Insurance Premiums promptly on demand. Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

8

under protest, and (vii) Borrower shall have furnished the security as may be required in the proceeding, or as may be requested by Lender to insure the payment of any contested Taxes, together with all interest and penalties thereon.

Section 3.5    ESCROW FUND□ In addition to the initial deposits with respect to Taxes and Insurance Premiums made by Borrower to Lender on the date hereof to be held by Lender in escrow, Borrower shall pay to Lender on the first day of each calendar month (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has obtained knowledge and authorizes Lender or its agent to obtain the bills for Taxes and Other Charges directly from the appropriate taxing authority. The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will apply the Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 3.3 and 3.4 hereof. If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 3.3 and 3.4 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall estimate as sufficient to make up the deficiency. The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. No earnings or interest on the Escrow Fund shall be payable to Borrower.

Section 3.6    CONDEMNATION□ Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender is hereby irrevocably appointed as Borrower's attorney-in-fact coupled with an interest, with exclusive powers to collect, receive and retain any award or payment for any taking accomplished through a condemnation or eminent domain proceeding and to make any compromise or settlement in connection therewith. All condemnation awards or proceeds shall be either (a) paid to Lender for application against the Debt or (b) applied to Restoration of the Property in accordance with Section 4.4 hereof. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein or in the Note. Any award or payment to be applied to the reduction or discharge of the Debt or any portion thereof may be so applied whether or not

10

without the prior written consent of Lender; and (E) shall not cancel or terminate the Leases or accept a surrender thereof, except that any Lease of less than 5,000 square feet may be canceled if at the time of the cancellation thereof a new Lease is entered into on substantially the same terms or more favorable terms as the canceled Lease.

        (d)    Borrower, as the lessor thereunder, may enter into proposed lease renewals and new leases without the prior written consent of Lender, provided each such proposed lease: (i) is not for greater than or equal to 5,000 square feet of the net rentable area of the Property; (ii) shall have an initial term of not less than three (3) years or greater than ten (10) years; (iii) shall provide for rental rates comparable to then-existing local market rates and shall be an arm's-length transaction; (iv) shall not contain any options for renewal or expansion by the tenant thereunder at rental rates which are either below comparable market levels or less than the rental rates paid by the tenant during the initial lease term; (v) shall be to a tenant which is experienced, creditworthy and reputable; and (vi) shall comply with the provisions of subsection (b) above. Borrower may enter into a proposed lease which does not satisfy all of the conditions set forth in clauses (i) through (v) immediately above, provided Lender consents in writing to such proposed lease, such consent not to be unreasonably withheld or delayed. Borrower expressly understands that any and all proposed leases are included in the definition of "Lease" or "Leases" as such terms may be used throughout this Security Instrument, the Note and the Other Security Documents. Borrower shall furnish Lender with executed copies of all Leases and any amendments or other agreements pertaining thereto within ten (10) days of the execution thereof.

        (e)    All security deposits of tenants, whether held in cash or any other form, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at such commercial or savings bank or banks as may be reasonably satisfactory to Lender. Any bond or other instrument which Borrower is permitted to hold in lieu of cash security deposits under any applicable legal requirements shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as hereinabove described, shall be issued by an institution reasonably satisfactory to Lender, shall, if permitted pursuant to any legal requirements, name Lender as payee or lender thereunder (or at Lender's option, be fully assignable to Lender) and shall, in all respects, comply with any applicable legal requirements and otherwise be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable legal requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Lender subject to the terms of the Leases.

        Section 3.8    MAINTENANCE OF PROPERTY☐Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 3.6 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Borrower shall not initiate, join in,

12

and total cash flow, and if available, any quarterly operating statement prepared by an independent certified public accountant, within thirty (30) days after the close of each calendar month; and

(iii)     an annual balance sheet and profit and loss statement of Borrower, in the form required by Lender, prepared and certified by Borrower, and, if available, any financial statements prepared by an independent certified public accountant within ninety (90) days after the close of each fiscal year of Borrower.

(b)     Upon request from Lender, Borrower and its affiliates shall furnish to Lender: (i) a property management report for the Property, showing the number of inquiries made and/or rental applications received from tenants or prospective tenants and deposits received from tenants and any other information reasonably requested by Lender, in reasonable detail and certified by Borrower (or an officer, general partner or principal of Borrower if Borrower is not an individual) under penalty of perjury to be true and complete, but no more frequently than quarterly; (ii) an accounting of all security deposits held in connection with any Lease of any part of the Property, including the name and identification number of the accounts in which such security deposits are held, the name and address of the financial institutions in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to obtain information regarding such accounts directly from such financial institutions; and (iii) an annual operating budget presented on a monthly basis consistent with the annual operating statement described above for the Property and all proposed capital replacements and improvements at least fifteen (15) days prior to the start of each calendar year.

(c)     Borrower and its affiliates shall furnish Lender with such other additional financial or management information as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender.

Section 3.12     PAYMENT FOR LABOR AND MATERIALS□Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined below). Nothing contained herein shall affect or impair Borrower's ability to diligently and in good faith contest any lien or bill for labor or materials, provided that any lien placed upon the Property must be fully and irrevocably discharged (by bond or otherwise) within 60 days after the date the same is first placed upon the Property.

Section 3.13     PERFORMANCE OF OTHER AGREEMENTS□Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an obligation secured hereby and any amendments, modifications or changes thereto.

14

B)     Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

C)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

Section 4.3     SINGLE PURPOSE ENTITY.    BORROWER HAS NOT AND SHALL NOT: (a) engage in any business or activity other than the ownership, development, operation and maintenance of the Property, and activities incidental thereto; (b) acquire or own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Property; (c) merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's consent; (d) fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's Partnership Agreement, Articles or Certificate of Incorporation or similar organizational documents, as the case may be, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect the ability of Borrower to perform its obligations hereunder, under the Note or under the Other Security Documents; (e) own any subsidiary or make any investment in, any person or entity without the consent of Lender; (f) commingle its assets with the assets of any of its general partners, affiliates, principals or of any other person or entity; (g) incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt except with respect to trade payables in the ordinary course of its business of owning and operating the Property, provided that such debt is paid within sixty (60) days of when incurred; (h) become insolvent and fail to pay its debts and liabilities from its assets as the same shall become due; (i) fail to maintain its records, books of account and bank accounts separate and apart from those of the general partners, principals and affiliates of Borrower, the affiliates of a general partner of Borrower, and any other person or entity; (j) enter into any contract or agreement with any general partner, principal or affiliate of Borrower, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any general partner, principal or affiliate of Borrower; (k) seek the dissolution or winding up in whole, or in part, of Borrower; (l) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any general partner, principal or affiliate of Borrower, or any general partner, principal or affiliate thereof or any other person; (m) hold itself out to be responsible for the debts of another person; (n) make any loans or advances to any third party, including any general partner, principal or affiliate of Borrower, or any general partner, principal or affiliate thereof; (o) fail to file its own tax returns; (p) agree to, enter into or consummate any transaction which would render Borrower unable to furnish the certification or other evidence referred to in Section 4.2(b) hereof; (q) fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is

16

Borrower's architect or engineer stating the entire cost of completing the Restoration, satisfactory to Lender; (C) the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of the Restoration; (D) Borrower shall deliver to Lender, at its expense, the insurance set forth in Subsection 3.3(a)(iii) hereof; (E) less than fifty percent (50%) of the total floor area of the Improvements has been damaged, destroyed, taken, or rendered unusable as a result of such fire or other casualty or taking, whichever the case may be; (F) Leases demising in the aggregate at least 50% of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such fire or other casualty or taking, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration and Borrower furnishes to Lender evidence satisfactory to Lender that MS-Grand Joliet, MS-Grand Aurora, and or MS-Grand Bridgeview (as applicable) ("**Grand Mart**") shall continue to develop, own and operate its Grand Mart International Food store or stores (as applicable) at the Property notwithstanding the occurrence of any such fire or other casualty or taking, whichever the case may be, and will make all necessary repairs and restorations thereto at their sole cost and expense; (G) Borrower shall commence the Restoration as soon as reasonably practicable and shall diligently pursue the same to satisfactory completion; (H) Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note at the Applicable Interest Rate (as defined in the Note), which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Subsection 3.3(a)(ii), if applicable, or (3) by other funds of Borrower which are deposited with Lender prior to the commencement of the Restoration; (I) Lender shall be satisfied that, upon the completion of the Restoration, the gross cash flow and the net cash flow of the Property will be restored to a level sufficient to cover all carrying costs and operating expenses of the Property, including, without limitation, debt service on the Note at a coverage ratio (after deducting replacement reserve requirements and reserves for tenant improvements and leasing commissions from net operating income) of at least 1.40:1.00, which coverage ratio shall be determined by Lender in its sole and absolute discretion based on Lender's underwritten net cash flow and the greater of the actual debt service constant or 7.60%; (J) Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date (as defined in the Note), (2) one (1) year after the occurrence of such fire or other casualty or taking, whichever the case may be, (3) the earliest date required for such completion under the terms of any Leases which are required to remain in effect subsequent to the occurrence of such fire or other casualty or taking in accordance with the provisions of this Subsection 4.4(b), or (4) such time as may be required under applicable zoning law, ordinance, rule or regulation in order to repair and restore the affected Property to the condition it was in immediately prior to such fire or other casualty or to as nearly as possible the condition it was in immediately prior to such taking,

18

Restoration. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Subsection 4.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 4.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage, provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of this Security Instrument. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Subsection 4.4(b) shall constitute additional security for the Obligations.

(vii)     With respect to Restorations related to casualties, the excess, if any, of the Net Proceeds, and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 4.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall

LA 126657654v6 2/27/2007

Section 5.4    VALIDITY OF DOCUMENTS (a)  The execution, delivery and performance by Borrower of the Note, this Security Instrument and the Other Security Documents and the borrowing evidenced by the Note (i) are within the corporate/ partnership/limited liability company (as the case may be) power of Borrower; (ii) have been authorized by all requisite corporate/partnership/limited liability company (as the case may be) action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership, trust or operating agreement, or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby); and (b) the Note, this Security Instrument and the Other Security Documents constitute the legal, valid and binding obligations of Borrower.

Section 5.5    LITIGATION There is no action, suit or proceeding, or any governmental investigation or any arbitration, in each case pending or, to the knowledge of Borrower, threatened against Borrower or the Property before any governmental or administrative body, agency or official which (i) challenges the validity of this Security Instrument, the Note or any of the Other Security Documents or the authority of Borrower to enter into this Security Instrument, the Note or any of the Other Security Documents or to perform the transactions contemplated hereby or thereby or (ii) if adversely determined would have a material adverse effect on the occupancy of the Property or the business, financial condition or results of operations of Borrower or the Property.

Section 5.6    STATUS OF PROPERTY   (a)    No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, or any successor law, or, if located within any such area, Borrower has obtained and will maintain the insurance prescribed in Section 3.3 hereof.

(a)    Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

(b)    The Property and the present and contemplated use and occupancy thereof are in compliance in all material respects with all applicable zoning ordinances, building codes, land use and environmental laws and other similar laws.

22

alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (d) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated (other than to Lender); (e) none of the Rents have been collected for more than one (1) month in advance; (f) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; and (g) there exist no offsets or defenses to the payment of any portion of the Rents.

Section 5.11    FINANCIAL CONDITION (a)  Borrower is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower has been initiated, and (b) Borrower has received reasonably equivalent value for the granting of this Security Instrument.

Section 5.12    BUSINESS PURPOSES The loan evidenced by the Note is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 5.13    TAXES Borrower has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Borrower does not know of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

Section 5.14    MAILING ADDRESSES Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

Section 5.15    NO CHANGE IN FACTS OR CIRCUMSTANCES All information submitted to Lender in connection with any request by Borrower for the loan evidenced by the Note and/or any letter of application, preliminary commitment letter, final commitment letter or other application or letter of intent (including, but not limited to, all financial statements, rent rolls, reports and certificates) are accurate, complete and correct in all respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

Section 5.16    DISCLOSURE Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 5.17    LETTER-OF-CREDIT RIGHTS If Borrower is at any time a beneficiary under a letter of credit relating to the properties, rights, titles and interests referenced in Section 1.1 of this Security Instrument now or hereafter issued in favor of Borrower, Borrower shall promptly notify Lender thereof and, at the request and option of Lender, Borrower shall, pursuant to an agreement in form and substance satisfactory to Lender, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the proceeds of any drawing under the letter of credit or (ii) arrange for the Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing in each case that the proceeds

24

Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 6.4    RELIANCE☐ Borrower recognizes and acknowledges that in accepting the Note, this Security Instrument and the Other Security Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article 5 without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Note, this Security Instrument and the Other Security Documents; and that Lender would not be willing to make the loan evidenced by the Note, this Security Instrument and the Other Security Documents and accept this Security Instrument in the absence of the warranties and representations as set forth in Article 5.

## Article 7- FURTHER ASSURANCES

Section 7.1    RECORDING OF SECURITY INSTRUMENT, ETC☐ Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the Other Security Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the Other Security Documents, any note or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 7.2    FURTHER ACTS, ETC☐ Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Applicable Laws. Borrower, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel

26

each Lease and that such amounts are consistent with the amounts required under each Lease, and (xiii) as to any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations secured hereby, the Property or this Security Instrument.

(b)     Borrower shall use best efforts to deliver to Lender, promptly upon request (provided such request is not made more than twice in any calendar year), duly executed estoppel certificates from any one or more commercial lessees as required by Lender attesting to such facts regarding the Lease as Lender may require, including but not limited to attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c)     Lender, by its acceptance of this Security Instrument, agrees to deliver to Borrower promptly upon Borrower's request therefor (provided such request is not made more than twice in any calendar year) a written statement setting forth the unpaid principal amount of the Note, the accrued and unpaid interest thereon and the date on which an installment of interest and/or principal were last paid thereunder.

Section 7.5     FLOOD INSURANCE[.] After Lender's request, Borrower shall deliver evidence satisfactory to Lender that no portion of the Improvements is situated in a federally designated "special flood hazard area."

Section 7.6     SPLITTING     OF     SECURITY     INSTRUMENT, MEZZANINE/ SUBORDINATE FINANCING[.] This Security Instrument and the Note shall, at any time until the same shall be fully paid and satisfied, at the sole election of Lender, be split or divided into two or more notes and two or more security instruments, each of which shall cover all or a portion of the Property to be more particularly described therein. To that end, Borrower, upon written request of Lender and at Lender's sole cost and expense, shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered by the then owner of the Property, to Lender and/or its designee or designees substitute notes and security instruments in such principal amounts, aggregating not more than the then unpaid principal amount of this Security Instrument, and containing terms, provisions and clauses similar to those contained herein and in the Note, and such other documents and instruments as may be required by Lender. In addition to the foregoing, Lender reserves the right to convert any portion of the Loan to subordinate financing, including one or more tranches of mezzanine debt, preferred equity, subordinate debt or participation in such loan, subordinate to such loan (collectively "**Subordinate Financing**"). If the Subordinate Financing takes the form of a mezzanine loan, a mezzanine borrower (the "**Mezzanine Borrower**") may be created which will own 100% of the ownership and economic interest in the Borrower. One hundred percent (100%) of the ownership and economic interests in the Mezzanine Borrower may, at Lender's discretion, be required to be pledged as security for such tranches of Subordinate Financing, if any. A default with the related Loan shall be a default under the respective Subordinate Financing. Such Subordinate Financing shall be subject to an intercreditor agreement by and between Lender and the subordinate lender(s). The individual coupon rates of any such Subordinate Financing, when blended, in the aggregate shall initially equal the Applicable Interest Rate (as defined in the Note).

28

managing partner or any profits or proceeds relating to such partnership interest, (iii) the transfer or pledge of more than 49% of the capital or profits of the partnership or (iv) the creation or issuance of new partnership interests by Borrower or its general partner which an aggregate of more than 49% of the ownership of partnership interests in such partnership shall be vested in a party or parties who do not now hold partnership interests in such partnership or joint venture; and (f) without limitation to the foregoing, any voluntary or involuntary sale, transfer, conveyance or pledge by any person or entity which directly or indirectly controls Borrower (by operation or law or otherwise) (a **"Principal"**) of its direct or indirect controlling interest in Borrower. Notwithstanding the foregoing, the following transfers shall not be deemed to be a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer within the meaning of this Article 8: (A) transfer by devise or descent or by operation of law upon the death of a partner, member, shareholder or stockholder of Borrower or any general partner thereof, and (B) a sale, transfer or hypothecation of a partnership, shareholder or membership interest in Borrower, whichever the case may be, by the current partner(s), shareholder(s) or member(s), as applicable, to a trust for the benefit of such person, or to an immediate family member (i.e., parents, spouses, siblings, children or grandchildren) of such partner, or shareholder or member or to a Principal (or a trust for the benefit of any such persons). Notwithstanding anything to the contrary contained herein (including, without limitation, the terms of the immediately preceding sentence), any sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer permitted or consented to which shall result in any party not now owning more than 49% of the ownership interests in Borrower acquiring more than 49% of the ownership interests in Borrower shall require the receipt by Lender of a substantive non-consolidation opinion acceptable to Lender.

Section 8.4    LENDER'S RIGHTS⊓ Lender reserves the right to condition the consent required hereunder upon a modification of the terms hereof and, if required, on assumption of the Note, this Security Instrument and the Other Security Documents as so modified by the proposed transferee, on payment of a transfer fee of one percent (1%) of the principal balance of the Note and all of Lender's expenses incurred in connection with such transfer, including without limitation the approval by any and all Rating Agencies, required by Lender, of the proposed transferee, the proposed transferee's continued compliance with the covenants set forth in Section 4.2 hereof, or such other conditions as Lender shall determine in its sole discretion to be in the interest of Lender. An assignment and assumption of the Note shall not be permitted within the first twelve (12) months from the date hereof. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property without Lender's consent. This provision shall apply to every sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property.

Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument;

      (c)     if the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender within five (5) days of Lender's request;

      (d)     if the Property is subject to actual waste;

      (e)     if Borrower violates or does not comply with any of the provisions of Sections 3.7 and 4.3 and Articles 8, 12 and 13, and does not cure the same within any notice or cure period provided therein;

      (f)     if any representation or warranty of Borrower or any person guaranteeing payment of the Debt or any portion thereof or performance by Borrower of any of the terms of this Security Instrument or any general partner, managing member, principal or beneficial owner of any of the foregoing, made herein or any guaranty or indemnity, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

      (g)     if (i) Borrower or any general partner or managing member of Borrower shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower, or any general partner or managing member of Borrower, shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower, or any general partner or managing member of Borrower, any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against the Borrower, or any general partner or managing member of Borrower, any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) the Borrower, or any general partner or managing member of Borrower, shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower, or any general partner of Borrower, shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

      (h)     if Borrower shall be in default beyond any applicable notice or cure period under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument;

(r)     a default beyond applicable notice or cure periods (if any) shall occur under any Other Security Documents.

Section 10.2   LATE PAYMENT CHARGE☐ If any sum payable under this Security Instrument or any of the Other Security Documents is not paid prior to the fifth (5th) day after the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law, to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, and such amount shall be secured by this Security Instrument and the Other Security Documents.

Section 10.3   DEFAULT INTEREST☐ Borrower will pay, from the date of an Event of Default through the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full, interest on the unpaid principal balance of the Note at a per annum rate equal to the lesser of (a) five percent (5%) plus the Applicable Interest Rate (as defined in the Note), and (b) the maximum interest rate which Borrower may by law pay or Lender may charge and collect (the "**Default Rate**").

### Article 11- RIGHTS AND REMEDIES

Section 11.1   REMEDIES☐ Upon the occurrence of any Event of Default, Borrower agrees that Lender or Mortgagee, acting on behalf of and at the sole discretion of Lender in its capacity as Lender's nominee, may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)     declare the entire unpaid Debt to be immediately due and payable;

(b)     institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entity or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(j)       apply any sums then deposited in the Escrow Fund and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument or any Other Security Document to the payment of the following items in any order in its discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) Interest on the unpaid principal balance of the Note; (iv) Amortization of the unpaid principal balance of the Note; (v) All other sums payable pursuant to the Note, this Security Instrument and the Other Security Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(k)       surrender the Policies maintained pursuant to Article 3 hereof, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such Insurance Premiums;

(l)       pursue such other remedies as Lender may have under applicable law;

(m)       apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; or

(n)       under the power of sale hereby granted, Lender shall have the discretionary right to cause some or all of the Property, including any Personal Property, to be sold or otherwise disposed of in any combination and in any manner permitted by applicable law.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. In the event of a sale, by foreclosure, power of sale, or otherwise, Lender may bid for and acquire the Property and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting against the Obligations the amount of the bid made therefor, after deducting therefrom the expenses of the sale, the cost of any enforcement proceeding hereunder and any other sums which Lender is authorized to deduct under the terms hereof, to the extent necessary to satisfy such bid. Notwithstanding the provisions of this Section 11.1 to the contrary, if any Event of Default as described in clause (i) or (ii) of Subsection 10.1(g) shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

Section 11.2    APPLICATION OF PROCEEDS☐ The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the Other Security Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. Upon any foreclosure sale or sales of all or any portion of the Property under the power of sale herein granted (if any), Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the Debt as a credit to the purchase price.

36

Section 11.7   OTHER RIGHTS, ETC☐ (a)  The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the Other Security Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the Other Security Documents.

(a)     It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(b)     Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 11.8   RIGHT   TO   RELEASE   ANY   PORTION   OF   THE PROPERTY☐Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 11.9   VIOLATION OF LAWS☐  If the Property is not in compliance with Applicable Laws, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 11.10  RIGHT OF ENTRY☐  Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

to any governmental authority or other person or entity, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to the Property; and relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property. "Hazardous Substances" include but are not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including but not limited to petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives provided, however, that "Hazardous Substances" shall not include cleaning materials customarily used at properties similar to the Property, to the extent such materials are used, stored and disposed of in accordance with Environmental Laws.

"Release" of any Hazardous Substance includes but is not limited to any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

"Remediation" includes but is not limited to any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance, any actions to prevent, cure or mitigate any Release of any Hazardous Substance, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to in Article 12.

Section 12.2  ENVIRONMENTAL COVENANTS□  Borrower covenants and agrees that so long as the Borrower owns, manages, is in possession of, or otherwise controls the operation of the Property:  (a) all uses and operations on or of the Property, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no Releases of Hazardous Substances by Borrower, its agents or employees in, on, under or from the Property; (c) there shall be no Hazardous Substances in, on, or under the Property, except those that are in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required; (d) the Property shall be kept free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other person or entity (the "Environmental Liens"); (e) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to Section 12.3 below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (f) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any written request of Lender (including but not limited to sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties (as defined herein) shall be entitled to rely on such reports and other results thereof provided, however, that no such request shall be made by Lender unless Lender has reasonable grounds to believe that a Release of Hazardous Substances

40

(the "Losses") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following, except to the extent any of the following are attributable to the gross negligence or willful misconduct of an Indemnified Party: (a) ownership of this Security Instrument, the Property or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Debt, and the Note, this Security Instrument, or any Other Security Documents; (c) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Security Instrument or the Note or any of the Other Security Documents, whether or not suit is filed in connection with same, or in connection with Borrower and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Security Instrument; (g) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (h) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (i) any failure of the Property to be in compliance with any Applicable Laws; (j) the enforcement by any Indemnified Party of the provisions of this Article 13; (k) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (l) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the loan evidenced by the Note and secured by this Security Instrument; or (m) any misrepresentation made by Borrower in this Security Instrument or any Other Security Document. Any amounts payable to Lender by reason of the application of this Section 13.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. For purposes of this Article 13, the term "**Indemnified Parties**" means Lender and any person or entity who is or will have been involved in the origination of the loan evidenced by the Note, any person or entity who is or will have been involved in the servicing of the loan evidenced by the Note, any person or entity in whose name the encumbrance created by this Security Instrument is or will have been recorded, persons and entities who may hold or acquire or will have held a full or partial interest in the loan evidenced by the Note (including, but not limited to, Investors (as defined herein) or prospective Investors in the Securities (as defined herein), as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the loan evidenced by the Note as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other person or entity who holds or acquires or will have held a participation or other full or partial interest in the loan evidenced by the Note or the Property, whether during the term of the loan evidenced by the Note or as a part of or following a

42

Property in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, under, on or above the Property, whether or not such Remediation is voluntary or pursuant to court or administrative order, including but not limited to any removal, remedial or corrective action; (e) any past, present or threatened non-compliance or violations of any Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon, including but not limited to any failure by Borrower, any person or entity affiliated with Borrower or any tenant or other user of the Property to comply with any order of any governmental authority in connection with any Environmental Laws; (f) the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Property; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in Article 12 and this Section 13.4; (h) any past, present or threatened injury to, destruction of or loss of natural resources in any way connected with the Property, including but not limited to costs to investigate and assess such injury, destruction or loss; (i) any acts of Borrower or other users of the Property in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Substances owned or possessed by such Borrower or other users, at any facility or incineration vessel owned or operated by another person or entity and containing such or similar Hazardous Materials; (j) any acts of Borrower or other users of the Property, in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites selected by Borrower or such other users, from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (k) any personal injury, wrongful death, or property damage arising under any statutory or common law or tort law theory, including but not limited to damages assessed for the maintenance of a private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Property; and (l) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to Article 12.

Section 13.5  DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES☐Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

## Article 14- WAIVERS

Section 14.1  WAIVER OF COUNTERCLAIM☐ Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the Other Security Documents, or the Obligations.

44

LOAN EVIDENCED BY THE NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THE NOTE, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER SECURITY DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

### Article 15- EXCULPATION

Section 15.1    EXCULPATION☐ Lender shall not enforce the liability and obligation of Borrower, to perform and observe the obligations contained in this Security Instrument, the Note, or the Other Security Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or any partner or member of Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon this Security Instrument, the Note, the Other Security Documents, and the interests in the Property; and any other collateral given to Lender pursuant to this Security Instrument and the Other Security Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower or any partner or member of Borrower only to the extent of Borrower's interest in the Property and in any other collateral given to Lender, and Lender, by accepting this Security Instrument, the Note and the Other Security Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower or any partner or member of Borrower, in any such action or proceeding, under or by reason of or in connection with this Security Instrument, the Note, or the Other Security Documents.  The provisions of this paragraph shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Security Instrument or the Other Security Documents, (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under this Security Instrument, (iii) affect the validity or enforceability of any guaranty made in connection with this Security Instrument or the Other Security Documents, (iv) impair the right of Lender to obtain the appointment of a receiver, (v) impair the enforcement of any assignment, or, (vi) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower or any general partner of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following: (a) fraud or misrepresentation by Borrower in connection with this Security Instrument, the Note or the Other Security Documents; (b) the gross negligence or willful misconduct of Borrower; (c) material physical waste of the Property; (d) the breach of provisions in this Security Instrument or the Other Security Documents concerning Environmental Laws and Hazardous Substances and any indemnification of Lender with respect thereto in any document; (e) the removal or disposal of any portion of the Property after default under the Note or the Other Security Documents; (f) the misapplication or conversion by Borrower of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (ii) any awards or other amounts received in connection with the condemnation of all or a portion of the Property, or (iii) any Rents following default under this Security Instrument, the Note or the Other Security Documents; (g) failure to pay Taxes (provided that the liability of Borrower shall be only for amounts in excess of the amount held by Lender in escrow for the payment of Taxes), assessments, charges for labor or materials or other charges that can create liens on any portion of the Property; (h) any security deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property

46

Section 16.3    NOTICES☐   All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof, (ii) one (l) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | MS Grand Holdings, LLC<br>4800 Walden Land,<br>Lanham, Maryland 20706-4884<br>Attention: Min Sik Kang |
| With a copy to: | Much Shelist<br>191 North Wacker Drive, Suite 1800<br>Chicago, Illinois 60606-1615<br>Attention: Michael D. Burstein |
| If to Lender: | Bear Stearns Commercial Mortgage, Inc.<br>383 Madison Avenue<br>New York, New York 10179<br>Attention: J. Christopher Hoeffel |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

Notices to Mortgagee hereunder and under any of the Other Security Documents shall include a copy thereof to Lender (to be addressed and delivered in accordance with this Section 16.3) and shall be sent as follows:

Mortgagee:

MERS Commercial
P.O. Box 2300
Flint, Michigan 48501-2300

For purposes of this Security Instrument, "Business Day" shall mean any day other than Saturday, Sunday or any other day on which banks are authorized or required to close in New York, New York.

## Article 17- SERVICE OF PROCESS

Section 17.1    CONSENT TO SERVICE☐   (a) Borrower will maintain a place of business or an agent for service of process in the State of Illinois and give prompt notice

applicable law. If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

### Article 19- SECONDARY MARKET

Section 19.1 TRANSFER OF LOAN☐ Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the Other Security Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage passthrough certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "**Securities**"). Lender may forward to each purchaser, transferee, assignee, servicer, participant or investor in such Securities or any Rating Agency rating such Securities (collectively, the "**Investor**") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, and the Property, whether furnished by Borrower, or otherwise, as Lender determines necessary or desirable. Borrower agrees to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Security Instrument, including, without limitation, the delivery of an estoppel certificate in accordance therewith, and such other documents as may be reasonably requested by Lender. Borrower shall also furnish and Borrower consents to Lender furnishing to such Investors or such prospective Investors or Rating Agency any and all information concerning the Property, the Leases, the financial condition of Borrower as may be requested by Lender, any Investor or any prospective Investor or Rating Agency in connection with any sale, transfer or participation interest. Lender may retain or assign responsibility for servicing the Note, this Security Instrument, and the Other Security Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer. Lender may make such assignment or delegation on behalf of the Investors if the Note is sold or this Security Instrument or the Other Security Documents are assigned. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

Section 19.2 CONVERSION TO REGISTERED FORM☐ At the request and the expense of Lender, Borrower shall appoint, as its agent, a registrar and transfer agent (the "**Registrar**") acceptable to Lender which shall maintain, subject to such reasonable regulations as it shall provide, such books and records as are necessary for the registration and transfer of the Note in a manner that shall cause the Note to be considered to be in registered form for purposes of Section 163(f) of the Code. The option to convert the Note into registered form once exercised may not be revoked. Any agreement setting out the rights and obligation of the Registrar shall be subject to the reasonable approval of Lender. Borrower may revoke the appointment of any particular person as Registrar, effective upon the effectiveness of the appointment of a replacement Registrar. The Registrar shall not be entitled to any fee from Lender or any other lender in respect of transfers of the Note and Security Instrument (other than Taxes and governmental charges and fees).

Section 19.3 COOPERATION☐ Borrower acknowledges that Lender and its successors and assigns may (a) sell this Security Instrument, the Note and Other Security Documents to one or more third parties as a whole loan, (b) participate the loan secured by this Security Instrument (the "Loan") to one or more third parties, (c) deposit, through one or a series

50

reasonable legal fees and disbursements of Lender, whether retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 20.2 ATTORNEY'S FEES FOR ENFORCEMENT□(a) Borrower shall pay all reasonable legal fees incurred by Lender in connection with (i) the preparation of the Note, this Security Instrument and the Other Security Documents and (ii) the items set forth in Section 20.1 above, and (b) Borrower shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or Personal Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property or Personal Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## Article 21- DEFINITIONS

Section 21.1 GENERAL DEFINITIONS□ Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower, each party comprising Borrower (if Borrower consists of more than one person or entity) and any subsequent owner or owners of the Property or any part thereof or any interest therein"; the word "Lender" shall mean "Lender and any subsequent holder of the Note"; the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument"; the word "person" shall include an individual, corporation, limited liability company, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

## Article 22- MISCELLANEOUS PROVISIONS

Section 22.1 NO ORAL CHANGE□ This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower, Lender or Mortgagee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 22.2 LIABILITY□ If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

LA 126657654v6 2/27/2007

every kind and nature whatsoever owned by Borrower and preceding the words "or in which Borrower has or shall have an interest":

> and all proceeds and products of and accessions to and substitutions and replacements for all such fixtures and other property owned by Borrower.

Section 23.5 SECURITY AGREEMENT. The text of Section 1.3 entitled "Security Agreement" is hereby deleted and the following is substituted therefor:

Borrower and Lender agree that this Security Instrument shall constitute a Security Agreement within the meaning of the Illinois Uniform Commercial Code (hereinafter referred to as the "Code") with respect to (i) all sums at any time on deposit for the benefit of Lender or held by the Lender (whether deposited by or on behalf of Borrower or anyone else) pursuant to any of the provisions of the Note, this Security Instrument or the other Loan Documents and (ii) with respect to any personal property included in the granting clauses of this Security Instrument, which personal property may not be deemed to be affixed to the Property or may not constitute a "fixture" (within the meaning of Section 9-103(41) of the Code) (which property is hereinafter referred to as "Personal Property"), and all replacements of, substitutions for, additions to, and the proceeds thereof (all of said Personal Property and the replacements, substitutions and additions thereto and the proceeds thereof being sometimes hereinafter collectively referred to as the "Collateral"), and that a security interest in and to the Collateral is hereby granted to the Lender, and the Collateral and all of Borrower's right, title and interest therein are hereby assigned to Lender, all to secure payment of the Debt. All of the provisions contained in this Security Instrument pertain and apply to the Collateral as fully and to the same extent as to any other property comprising the Property; and the following provisions of this paragraph shall not limit the applicability of any other provision of this Security Instrument but shall be in addition thereto:

(i)     Borrower (being the Debtor as that term is used in the Code) is and will be the true and lawful owner of the Collateral, except such incidental furnishings, fixtures and equipment which are leased by Borrower, such as furniture in model apartments and club houses, and whose value, in the aggregate, is immaterial relative to the owned collateral, subject to no liens, charges or encumbrances other than the lien hereof, other liens and encumbrances benefiting Lender and no other party, and liens and encumbrances, if any, expressly permitted by the other Loan Documents;

(ii)     The Collateral is to be used by Borrower solely for business purposes;

(iii)     The Collateral will be kept at the Property (except for normal replacement of Personal Property) and will not be removed therefrom without the consent of Lender (being the Secured Party as that term is used in the Code). The Collateral may be affixed to the Property but will not be affixed to any other real estate;

(iv)     The only persons having any interest in the Property are Borrower, Lender and holders of interests, if any, expressly permitted hereby;

(v)     No financing statement (other than financing statements showing Lender as the sole secured party, or with respect to liens or encumbrances, if any, expressly permitted hereby)

LA 126657654v6 2/27/2007

Instrument is to be filed for recording with the recorder of deeds of the county or counties where the Property is located. Borrower is the record owner of the Property;

(ix)     To the extent permitted by applicable law, the security interest created hereby is specifically intended to cover all Leases between Borrower or its agents as lessor, and various tenants named therein, as lessee, including all extended terms and all extensions and renewals of the terms thereof, as well as any amendments to or replacement of said Leases, together with all of the right, title and interest of Borrower, as lessor thereunder; and

(x)     The address of Borrower, from which information concerning the security interests in the Collateral may be obtained, is set forth on page 1 of this Security Instrument.

Section 23.6  ILLINOIS MORTGAGE FORECLOSURE ACT.

(a) In the event any provision in this Security Instrument shall be inconsistent with any provision of the Illinois Mortgage Foreclosure Law (735 ILCS Sections 5/15-1101 et. seq., Illinois Compiled Statutes) (the "Foreclosure Act"), the provisions of the Foreclosure Act shall take precedence over the provisions of this Security Instrument, but shall not invalidate or render unenforceable any other provision of this Security Instrument that can be construed in a manner consistent with the Foreclosure Act.

(b)     If any provision of this Security Instrument shall grant to Lender any rights or remedies upon default of Borrower which are more limited than the rights that would otherwise be vested in Lender under the Foreclosure Act in the absence of said provision, Lender shall be vested with the rights granted in the Foreclosure Act to the full extent permitted by law.

(c)     Without limiting the generality of the foregoing, all expenses incurred by Lender to the extent reimbursable under Sections 15-1510 and 15-1512 of the Foreclosure Act, whether incurred before or after any decree or judgment of foreclosure, and whether enumerated in Section 8.3 of this Security Instrument, shall be added to the indebtedness secured by this Security Instrument or by the judgment of foreclosure.

Section 23.6  WAIVER. Borrower hereby waives (a) its statutory rights of redemption and reinstatement and (b) its homestead rights, to the fullest extent allowable by applicable law, including without limitation the Foreclosure Law.

Section 23.7  FUTURE ADVANCES. To the extent lender is obligated to make advances, borrower acknowledges and intends that all such advances, including future advances whenever hereafter made, shall be a lien from the time this security instrument is recorded, as provided in section 5/15-1302(b)(1) of the Foreclosure Act. That portion of the Obligations which comprises the principal amount then outstanding constitutes revolving credit indebtedness secured by a mortgage on real property, pursuant to the terms and conditions of the Foreclosure Act. Borrower covenants and agrees that this security instrument shall secure the payment of all loans and advances made by lender, whether such loans and advances are made as of the date hereof, or at any time in the future, and whether such future advances are obligatory, or are to be made at the option of lender or otherwise (but not advances or loans made more than twenty (20) years after the date hereof), to the same extent as if such future advances were made on the date of the execution of this security instrument and, although there may be no other indebtedness

56

(G)     expenses incurred and expenditures made by Lender for any one or more of the following: (1) if the Property or any portion thereof constitutes one or more units under a condominium declaration, assessments imposed upon the unit owner thereof which are required to be paid; (2) if Lender's interest in the Property is a leasehold estate under a lease or sublease, rentals or other payments required to be made by the lessee under the terms of the lease or sublease; (3) premiums for casualty and liability insurance paid by Lender whether or not Lender or receiver is in possession, if reasonably required, in reasonable amounts, and all renewals thereof, without regard to the limitation to maintaining of existing insurance in effect at the time any receiver or Lender takes possession of the Property imposed by Subsection (c)(1) of Section 15-1704 of the Foreclosure Act; (4) repair or restoration of damage or destruction in excess of available insurance proceeds or condemnation awards; (5) payments required or deemed by Lender to be for the benefit of the Property or required to be made by the owner of the mortgaged real estate under any grant or declaration of easement, easement agreement, agreement with any adjoining land owners or instruments creating covenants or restrictions for the benefit of or affecting the Property; (6) shared or common expense assessments payable to any association or corporation in which the owner of the Property is a member in any way affecting the Property; (7) if the loan secured hereby is a construction loan, costs incurred by Lender for demolition, preparation for and completion of construction, as may be authorized by the applicable commitment, loan agreement or other agreement; (8) pursuant to any lease or other agreement for occupancy of the Improvements for amounts required to be paid by Borrower; and (9) if this Security Instrument is insured, payments of FHA or private mortgage insurance required to keep insurance in force.

(ii)     All Protective Advances shall be so much additional indebtedness secured by this Security Instrument, and shall become immediately due and payable without notice and with interest thereon from the date of the advance until paid at the rate due and payable after a default under the terms of the Note.

(iii)     This Security Instrument shall be a lien for all Protective Advances as to subsequent purchasers and judgment creditors from the time this Security Instrument is recorded pursuant to Subsection (b)(1) of Section 15-1302 of the Foreclosure Act.

(iv)     All Protective Advances shall, except to the extent, if any, that any of the same is clearly contrary to or inconsistent with the provisions of the Foreclosure Act, apply to and be included in:

(A)     determination of the amount of indebtedness secured by this Security Instrument at any time;

(B)     the indebtedness found due and owing to this Security Instrument in the judgment of foreclosure and any subsequent supplemental judgments, orders, adjudications or findings by the court of any additional indebtedness becoming due after such entry of judgment, it being agreed that in any foreclosure judgment, the court may reserve jurisdiction for such purpose;

58

may be added to the Obligations. The cost of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

[remainder of page intentionally left blank; signature page follows]



## ACKNOWLEDGMENT

STATE OF _V A_ )
                ) ss:
COUNTY OF _Fairfax_ )

      The undersigned, a Notary Public in and for the said County, in the State aforesaid, DO HEREBY CERTIFY that Min Sik Kang, the Managing Member of MS-Grand Investment, LLC, an Illinois limited liability company, which is in turn the Manager of MS-Grand Holdings Illinois, LLC, an Illinois limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Managing Member, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability companies, on behalf of said limited liability companies, for the uses and purposes therein set forth.

      GIVEN under my hand and notarial seal this 27 day of February, 2007.

                                  _____
                                    Notary Public

                             My Commission Expires:

                             Feb 28, 2009

File No.: NCS-246142-CHI1

Legal Description:

PARCEL 1:

LOT 1 IN DAVID'S SUBDIVISION OF PART OF THE EAST HALF OF THE SOUTHEAST QUARTER OF
SECTION 12, TOWNSHIP 37 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN,
ACCORDING TO THE PLAT THEREOF RECORDED APRIL 11, 2000 AS DOCUMENT NO. 00250979, IN
COOK COUNTY, ILLINOIS.

PARCEL 2:

EASEMENT FOR PARKING, INGRESS AND EGRESS FOR THE BENEFIT OF PARCEL 1 AS CREATED BY
AGREEMENT DATED FEBRUARY 24, 1995 AND RECORDED MARCH 14, 1995 AS DOCUMENT NO.
95171424 AND FIRST AMENDMENT THEREOF DATED APRIL 16, 1999 AND RECORDED JUNE 17, 1999 AS
DOCUMENT NO. 99582111.

10280 South Harlem Avenue
Bridge view, IL 60455
Pin # 23-12-400-004